ST. PAUL, J.
 

 In 1902 the town of Vidalia granted to plaintiff a franchise for a ferry across the Mississippi river, to run for 20 years from March, 1906. The rates were fixed on most articles, but not on automobiles which had not then come into general use. It was provided, however, that rates not fixed in the grant should be fixed by agreement, otherwise by arbitration. Some ten years ago the plaintiff fixed rates on automobiles,
 
 *341
 
 satisfactorily to himself and acquiesced in (?) by the public (since there was nothing else for the public to do). In February,
 
 1923,
 
 the town council attempted to fix compulsory rates on automobiles (leaving the franchise, otherwise intact), and plaintiff enjoined on numerous grounds, all of which resolve themselves finally into these four: (1) That the contract was violated, (2) that the town council was not a rate-making body, (3) that the rates were fixed without a hearing, and (4) that they are unreasonable.
 

 The trial judge perpetuated the injunction on the third ground, and defendant appeals.
 

 I.
 

 It is wholly unnecessary in this case to enter into any discussion whether a munici-' pal corporation can enter an inviolable contract with a public service corporation as to the rates at which Such service shall be furnished to the public; whether such a contract is an alienation or abridgement of the police power, or a mere exercise thereof; whether the presence or absence from a state Constitution of a prohibition against an abridgment of the police power alters the situation in'any way — as to all of which the authorities are not free from' confusion. Suffice it to say that in this case the town council is not seeking to alter the contract except in so far as the same provides that as to rates not fixed in the franchise they shall be fixed by agreement or arbitration.
 

 And as to that we are satisfied that the action of the town -council was ultra vires and void. For whether such rates be fixed by contract or otherwise, they are manifestly
 
 compulsory
 
 so far as they affect the public, who must either pay the rates fixed or go without. And since public utilities are for all practical purposes public necessities, and virtual monopolies, it follows that the rate fixed for such necessities are-in effect a
 
 tax
 
 upon the public for such public service. In this state a ferry is made a monopoly by law. Act 68 of 1896, p. 101.
 

 The fixing of such rates is therefore essentially a
 
 legislative
 
 function; and being such it cannot be made a matter of
 
 arbitration,
 
 since to make it such is simply to delegate to arbitrators the power to fix such rates; and this cannot be done.
 

 . “Municipal councils, or other functionaries of government, cannot renounce the powers vested in them by the Constitution and laws. An ordinance of a municipality which makes even a partial surrender of political power is null.” Third Municipality v. Ursuline Nuns, 2 La. Ann. 611.
 

 On the other hand, an agreement
 
 to agree
 
 is no agreement at all, since either party may avoid it by mere failure to agree.
 

 Since the agreement to agree was vain, and the agreement to arbitrate was void, it follows that either plaintiff might charge what he pleased upon automobiles transported over his monopoly, or that the town council had the right to fix the rates; for there was in 1902 no public service commissions authorized to fix ferry rates.
 

 And it would seem that the question whether plaintiff or the town council had the power to fix the rates
 
 ought to answer itself,
 
 since an unbridled monopoly of a public necessity would be an anomaly under a
 
 free,
 
 not to say a civilized, government.
 

 li-
 

 Under paragraph 9 of section 2743, Revised Statutes of 1870, amended by Act 202 of 1902, p. S9Í, the police juries of the several parishes have the right of establishing ferries and of “fixing the rates of ferriage”, thereon. This power, however, “shall not extend
 
 * * * to
 
 any ferries * * * within the control of municipal corporations.”
 

 From this it follows either that ferries within the control of municipal corporations shall be subject to
 
 no control whatever
 
 as! to
 
 *343
 
 the rates which they might charge for fer- . riage, or that such rates are subject to the control of the municipalities.
 

 But can it be supposed for a moment that the Legislature meant to provide that ferriage tolls should be subject to regulation in the sparsely settled rural communities, but not subject to regulation in populous urban communities ; that our solons were straining at gnats and swallowing camels?
 

 Hence it cannot but be that the right to establish a ferry (meaning thereby an exclusive privilege) carries with it necessarily the right to fix the rates.
 

 But if the right to fix the rate exists in the municipality, how is that right to be exercised. The answer may be, “By contract.” Granted; but where is the law or the logic, which says that such power to fix rates shall be exercised
 
 only by contract?
 
 If there be any such, the writer hereof is unable to discover it. For although the power to contract for rates
 
 for itself
 
 does result from the inherent power of a municipality to make contracts, yet it is perfectly obvious that the fight to fix rates for its inhabitants is derived not from the right to make contracts, but from the
 
 police power.
 

 And again what is to be done when the contract grants a franchise, but fails to provide (as in this case) for a tariff covering articles known or unknown at the time of the contract? Is the municipality powerless to fix such tariff unless with the consent of the grantee, which is the same thing as to say that the grantee may charge what he pleases? That is precisely what the grantee claims (in effect) in the case at bar. He has established his own tariff; if the town agrees, it is very well; if the town does not agree, it is equally as well, since he goes on collecting such tariff just the same as if the town had agreed. As to the matter of arbitration, we have already disposed of that.
 

 Our conclusion is that ferries under the control of municipalities are subject to regulation by the governing authorities of such municipalities'as to all rates and tariffs not-established by the franchise itself. Whether or not the rates established by the franchise may be changed without the consent of the grantee is a matter we are not called upon to determine in this case, and we therefore refrain from expressing any opinion thereon.
 

 The town of Vidalia is incorporated under the “Lawrason Act,” No. 136 of 1898, and under paragraph 32 of section 15 of that act the town had power “to license ferries and to regulate the same and the landing thereof within the corporate limits.” It has therefore
 
 control
 
 over plaintiff’s ferry, and may fix all such rates (at least) as are not fixed in the franchise.
 

 To sum up the whole: The right (if any) of a municipal corporation to fix the rates for a public service rendered to its inhabitants does not come from the inherent power
 
 to contract,
 
 but from the
 
 police power;
 
 such grant of police power may be express or may result from necessary implication; it is necessarily implied when the municipality has the power to grant directly or indirectly an exclusive franchise for such public service; and whether the rates fixed at the time of granting such franchise be or be not a contract, the right to fix by compulsion rates not fixed by franchise necessarily resides with the municipality and not with the grantee.
 

 III.
 

 We have already said, and we repeat, that the fixing of rates for public service is a legislative function. See Vicksburg S. & P. R. Co. v. Railroad Commission, 153 La. 983, 96 So. 832.
 

 Legislative bodies, however, proceed in their own initiative. They are not like courts, which can proceed only when urged thereto by some party in interest. There is
 
 *345
 
 no such thing as
 
 citation,
 
 or summons, required to enable a legislative body to proceed with its business. It proceeds upon such evidence as it thinks sufficient, and obtains such evidence in the manner it deems proper; no formal pleadings are necessary or even permitted ; it is not handicapped in its search for the truth by the formalities required in a court of law. Nevertheless the results obtained by legislative bodies are not appreciably any more unfair than the results obtained by courts.
 

 Be that as it may, a legislative body is not required to give parties, who may be affected by its action, the formal hearing required in a court of law. If it were, there would, of course, be an end to all legislation, for who is not affected by the least legislative action; and the whole community cannot be cited or summoned to show cause why this or that legislation should not be had.
 

 Hence it suffices, to constitute
 
 due process of law,
 
 that parties affected by legislation should be given an opportunity to be heard when it is attempted to
 
 execute
 
 the provisions enacted by the legislator. Until then they cannot be hurt.
 

 In the case at bar the plaintiff has been given his opportunity to* urge before the courts the objections which he might have urged before the town council; and has been duly heard thereon, which is all that he is entitled to.
 

 His objections have all been considered and disposed of. All except one, to wit, that the rate fixed by the ordinance does not allow him a fair return upon his investment; and that objection we will now proceed to consider.
 

 IV.
 

 The presumption is that all legislation is valid and fair, and whoever alleges the contrary assumes the burden of establishing his charge. Hence it follows that plaintiff in this case must show by á fairly reasonable preponderance of evidence that the rate fixed by the town council is not a fair one. And our conclusion is that he has failed in his proof.
 

 Three of the judges of this court have read the transcript herein, and our conclusion is that plaintiff has not made a full and fair exposition of the receipts and expenses of operating his ferry; the receipts claimed by him do not correspond at all with a close check kept upon his business by an agent for defendant during the six weeks before this case came up for trial; and from the start plaintiff has made every effort to exclude defendant from any opportunity to get at his receipts and expenditures. It is also apparent that plaintiff is consuming the greater part of those receipts whatever they may be, in high salaries for himself and his sons, which the testimony fails to convince us as being necessary for the proper conduct of the ferry.
 

 Moreover, his estimate of the capital invested in the enterprise is so grossly exaggerated as to furnish not the least basis on which to predicate what would be a fair return. One instance only will suffice. He estimates his ferryboat at $130,000, but apart from his own vague testimony in support of this estimate, he produces no other testimony than that two alleged experts, one of whom makes an admitted error of nearly $80,000 in calculating ■ the value of the steel required for the hull; and had already estimated a better ferryboat in New Orleans for less than one-half the value of plaintiff’s. The other bases his estimate upon the value of another vessel to which he compares it, which latter vessel is shown to be several times larger than plaintiff’s. On the other hand, a witness for defendant, at least as well qualified as plaintiff’s witnesses, testified that he was then building a larger and better boat than plaintiff’s for about $28,000.
 

 On the whole, we are satisfied that plain
 
 *347
 
 tiff has wholly failed to make out his case. And in this connection it may he remarked that whenever a litigant seeks the intervention of a court in a matter such as this, he ought to bring forward a clear and succinct statement of his receipts and expenses, and of the amount and value of his investments. In the state of the record before us, we cannot reach even the faintest clue as to what plaintiff’s receipts and expenses and investment may be; but we are convinced that he has grossly exaggerated the amount of his investment, and are not satisfied that he has made a correct return of his receipts, or that the expenses claimed by him are .justified.
 

 We must therefore reject his claim for want of proper evidence to support it; but we see no grounds for allowing attorney’s fees.- ■
 

 Decree.
 

 The judgment appealed .from is therefore reversed; and it is now ordered that the injunction herein issued be dissolved, and plaintiff’s demand rejected at his cost in both courts.
 

 OVERTON, X, dissents.
 

 LAND, X, dissents and hands down reasons.